UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| MAAHNCHOOH GHOGOMU, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | Case No. 14-CV-48-JED-TLW |
|  | ) | 14-CV-49-JED-PJC |
| DELTA AIRLINES GLOBAL SERVICES, LLC, et al., | ) |  |
|  | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## OPINION AND ORDER

Before the Court are plaintiff Maahnchooh Ghogomu's and defendants DAL Global Services, LLC and John Watts's cross-motions for summary judgment (Docs. 89 and 129). After the plaintiff filed his summary judgment motion but before the defendants filed theirs, the plaintiff amended his complaint. As a result, the plaintiff has arguably abandoned his primary claim—that is, discrimination prohibited by Title VII of the Civil Rights Act of 1964. Given the plaintiff's pro se status, and the Court's ruling on the motions for summary judgment, the Court does not reach this issue, and assumes *arguendo* that the plaintiff properly brings the following claims: (1) disparate treatment and wrongful termination on the basis of race and national origin; (2) defamation; and (3) intentional infliction of emotional distress.

### BACKGROUND

The plaintiff, proceeding pro se, offers his version of events largely without evidence. In what follows, the Court has chosen to present the defendants' uncontested facts first—the facts on which the Court bases its ruling—and then give space to the plaintiff's allegations, with footnotes briefly explaining why the plaintiff's claims are not supported by evidence as required at the summary judgment stage.

*1. Defendants' Undisputed Facts*

On April 22, 2013, Delta Flight 5188 landed in Detroit with an open fuel panel door and a missing fuel cap. Either before or as it detached, the fuel cap banged against and damaged the aircraft's wing. Flight 5188 originated in Tulsa, Oklahoma, where Delta Air Lines Global Services, LLC ("DGS") had prepared the flight for takeoff. As DGS's Station Manager in Tulsa, defendant John Watts was notified of the missing fuel cap and damage done to the aircraft and began an investigation. According to Watts, he hoped first to determine whether the plane left Tulsa with an exposed fuel tank or whether the panel and cap had somehow opened in flight. DGS teams preparing planes for takeoff from the Tulsa International Airport include a "pushback driver" who, among other responsibilities, conducts the final "walk around" of an aircraft before it leaves the airport. Because the pushback driver is the last team member to check that all panels, including the fuel panel, are closed and secure, Watts set about trying to determine which of his ramp agents had acted as pushback driver for Flight 5188.

When none of the ramp agents on duty that morning admitted to being the pushback driver, Watts requested that they provide written statements. Plaintiff Maahnchooh Ghogomu, one of the on-duty ramp agents, wrote that he "DID NOT MARSHALL [sic] OUT FLIGHT 5188 THIS MORNING." (Doc. 130-2 at 21). The plaintiff then, using carets, inserted the word "REMEMBER" and the suffix "ING," so that his statement read "I DID NOT REMEMBER MARSHALLING OUT FLIGHT 5188 THIS MORNING." (*Id.*). DGS ramp agents Trevor Allard and Evan Kollatz also provided statements. Allard wrote that "Ghogomu I believe was driving push back [sic] for this flight at this time." (Doc. 130-2 at 22). A day after the incident, Kollatz wrote that he had helped Ghogomu, Allard, and two others load baggage onto Flight 5188, and then left to see to another flight. (Doc. 130-2 at 32).

During the investigation, Watts contacted Heather Fritts, the Deputy Airport Security Manager for the Tulsa Airport, and asked to review surveillance footage of Flight 5188's preparation. Allard and Linda Carter, another DGS employee, watched the video with Watts. All agreed that the DGS "crew member with dark skin, wearing an orange/red vest and a hoodie, [and acting] as the pushback driver for Flight 5188," was the plaintiff. (Doc. 130-2 at 5). The plaintiff himself testified that he "always wore" a hooded sweatshirt and that he likely "was the only person [wearing a hooded sweatshirt that day] because I had that. You know, I'm very . . . sensitive to cold." (Doc. 130-1 at 154:7-24). The video also confirmed Allard's claim, in his written statement, that he was the "wing walker" for Flight 5188, meaning that he was not responsible for the final walk around. Finally, the video revealed that no one—not the wing walker, not the pushback driver identified as the plaintiff—performed a final walk around for Flight 5188. The pushback driver had not met his obligation. If the aircraft's fuel panel was open and its fuel cap missing just before takeoff, no one on the DGS team was in a position to know it.[1]

A day after the incident, Watts wrote Corporate Human Resources to recommend that DGS terminate the plaintiff's employment. Watts's termination recommendation began by recounting counseling and discipline the plaintiff had received in the 10 months since beginning his employment with DGS.[2] There were six such incidents. On September 5, 2012, the plaintiff

---

[1] The fueler for Flight 5188, Brandon Fortenberry, was not a DGS employee. In his statement, provided at Watts's request, Fortenberry wrote that he "d[id] not recollect reinstalling the fuel cap and/or closing the fuel panel door" after he finished fueling the aircraft. (Doc. 130-2 at 26). In response to a complaint lodged by the plaintiff, the Federal Aviation Administration conducted an investigation and found that Fortenberry "fail[ed] to secure the fuel cap and door," and that the fueling contractor that employed him counseled him as a result. (Doc. 130-10).

[2] The plaintiff represents that he worked for Pinnacle Airlines for three and a half years without complaints regarding his job performance. Watts also worked for Pinnacle. In 2012 Pinnacle

was reprimanded for signing a timesheet indicating he had completed his shift despite leaving before the shift's end. (Doc. 130-2 at 32). On October 14 and 15, 2012, the plaintiff missed two days of scheduled shifts. (*Id.* at 12). In writing, he apologized "for any inconvenience" and explained that he could not find anyone to cover his shift which he had to miss because "I have to be at my full time job." (*Id.* at 32). A day after his apology note, on October 22, 2012, the plaintiff missed another shift. "Calling into to [sic] work to go to another job is unacceptable," his supervisor wrote in a Warning Letter. "Any additional problems in this area, or any infraction of Company policy or failure to meet Company standards, may result in more serious discipline up to and including termination." (*Id.* at 12). The plaintiff was disciplined a fourth time on December 8, 2012, this time receiving a Counseling Form regarding his "Job Performance" as he had "failed to complete the Aircraft Seal Verification Log." (*Id.* at 13).

Several months passed without an incident. Then, at the end of March, the plaintiff missed two shifts. The plaintiff had flown to Africa to visit his sick sister and found himself stranded in Johannesburg, unable to find a flight to Atlanta that would accept so-called non-revenue or buddy pass passengers. (Doc. 92 at 30). Watts acknowledged that the plaintiff's absence was "due to non-revenue travel" complications, but informed the plaintiff that his missed shifts were nevertheless "unexcused absences" and accordingly suspended the plaintiff's flight privileges for 90 days. (Doc. 103-2 at 14). Additionally, in light of the plaintiff's "poor attendance record," Watts issued the plaintiff a "Final Warning." (*Id.*). "It is imperative that you understand the seriousness of your situation and take immediate steps to improve your

---

filed for bankruptcy and DGS hired Watts as Station Manager. He recommended that DGS hire the majority of Pinnacle's employees, including the plaintiff. According to the termination recommendation, the plaintiff was hired on June 26, 2012. According to John Watts's affidavit, the plaintiff began work as a DGS ramp agent on August 14, 2012.

attendance record," Watts wrote in the Final Warning Letter. (*Id.*). "Failure to show immediate and lasting improvement in this area, or any infraction of Company policy or failure to meet Company standards," Watts continued, upgrading the warning in the plaintiff's October 2012 letter from possibility to probability, "will likely result in the termination of your employment." (*Id.*).

The plaintiff signed the Final Warning Letter on April 6, 2013. Four days after his final warning, he received another Job Performance Counseling Form, this time for "fail[ing] to make sure all ramp equipment was turned off and chocked," which the Counseling Form noted "could cause serious aircraft damage."[3] (*Id.* at 19). The open fuel tank, which did damage an aircraft, was to be the third discipline-warranting incident tied to the plaintiff that month, and the seventh in approximately 10 months. Watts's termination recommendation, after listing five of these incidents, went on to describe the open fuel tank and ensuing investigation as follows:

> On 04/22/2013 flight 5188 arrived in DTW from TUL and it was found to have damage upon arrival. A fuel panel door was left open and the fuel cap was missing. Donald [Ghogomu] was the pushback driver for this flight. After investigating all agents involved along with viewing the airport security video it has been verified that Donald was the pushback driver and he did not conduct the final [aircraft] walk around inspection. Maahnchooh (Donald) Ghogomu's behavior is unacceptable and he has been clearly advised of the need for improvement in this area, but has failed to do so. Therefore, I recommend Maahnchooh (Donald) Ghogomu's employment be terminated.

(Doc. 130-2 at 29). Human Resources approved Watts's termination recommendation on May 3, 2013. (*Id.* at 31).

---

[3] As detailed below, the plaintiff claims neither this infraction nor the resulting counseling occurred. Viewing the facts in the light most favorable to the plaintiff, the facts related to the April 2013 ramp equipment violation are contested. They are also immaterial, however, and not relied upon in the Court's ruling.

2. *Plaintiff's Version of Events Surrounding His Termination*

The plaintiff tells a different story. He alleges that the change from Pinnacle to DGS brought not only new management but racially discriminatory policies. In what these purported policies consisted is far from clear, but the plaintiff, who identifies himself as black and who immigrated from Cameroon, asserts that employees were awarded bidding schedules only to find that, "within a few weeks, the new bid schedules suddenly changed. . . . This was clearly a mechanism derived and targeted towards certain employees of color . . . as a means to discourage them from continuing to work for DGS."[4] (Doc. 90 at 3). In addition, the plaintiff alleges that DGS did not grant vacation to employees of color as readily as it did to white employees.

According to the plaintiff, he was a victim of these purportedly discriminatory policies and confronted his superiors about them. His central claim is as follows: Unhappy with the plaintiff's defiance in the face of their discrimination, DGS used Flight 5188 as a pretext to eliminate him. "[A]n atmosphere of resentment gradually built up against Plaintiff, resulting to increased surveillance. . . . [and f]ictitious and fabricated document for job performance. . . . [and] culminat[ing] in the use of the aircraft incident against Plaintiff in retaliation [sic]." (Doc.

---

[4] The plaintiff does not explain how these alleged policies operated to affect people of color or immigrants disproportionately. Nor does he offer any evidence to support his broad and conclusory statements. When the plaintiff does provide documentation, elsewhere in his motion, the documents do not support his claims. For example, the plaintiff writes that he "was discriminated against for his race, color and national origin and further discriminated and retaliated against for speaking-up/opposing DGS's discriminating practices," and cites to (1) a Certificate of Recognition and accompanying letter presented to the plaintiff after one year of work at Pinnacle; (2) a letter from the plaintiff to Watts, acknowledging the he was threatened with termination for missing a shift to work at his other job and suggesting both that it was the result of a misunderstanding and that all employees should "adhere to [the] same principles or standards"; and (3) a letter from the plaintiff to Watts explaining that recent schedule changes have created conflicts with his other job and listing the days he can and cannot work. (Doc. 92 at 6). Nothing in any of the documents supports a claim, or even suggests, that DGS's policies were racially discriminatory, that the plaintiff confronted his superiors about those policies, or that the plaintiff was discriminated against on the basis of his race, color, or country of origin.

133 at 11). The plaintiff contends he was not assigned to Flight 5188's ground crew, that no videotape depicting him acting as pushback driver for that flight ever existed, that DGS coerced its employees to write reports and affidavits describing the videotape, and that DGS forged portions of his workplace discipline history, all in order to generate a pretext for firing him.

*First*, the plaintiff asserts that the evidence of a history of workplace counseling and discipline is in part fabricated and wholly irrelevant. He compares the Counseling Form dated April 9, 2013, with Counseling Forms he received on September 5, 2012, and December 8, 2012, and notes that while the latter forms bear his signature, the former lacks even a place for it. (Doc. 133 at 1). The unsigned Counseling Form describes a job performance incident that could have caused aircraft damage and which occurred in the same month as the incident that led to his termination.

The plaintiff does not contest that the remaining five incidents, including a Warning Letter and a Final Warning Letter, occurred. He does argue, however, that including these incidents in the letter recommending his termination only reveals the pretextual nature of his firing, as they involved reprimands for "attendance or conduct reasons" whereas Watts claims he recommended the plaintiff's termination "due to job performance following aircraft incident (not attendance or conduct reasons)."[5] (*Id.* at 2).

---

[5] As evidence supporting this proposition, the plaintiff cites Watts's letter recommending his termination. The letter refers once to conduct (falsifying a timesheet), twice to performance (failure to complete Aircraft Seal Verification Log and the unsigned April 9, 2013 citation), and twice to Warning Letters regarding attendance. (Doc. 130-2 at 29). Both Warning Letters, it will be remembered, warn Ghogomu that he could face ("may result in"; "will likely result in") termination for "*any* infraction of Company policy or failure to meet Company standards." (Doc. 130-2 at 12, 14) (emphasis added). Without doubt, the plaintiff failed to meet company standards when, as indicated by the only evidence before the Court, he neglected to conduct a final walk around of Flight 5188.

7

*Second*, the plaintiff attacks the videotape that John Watts, Trevor Allard, and Linda Carter all claim showed that the plaintiff was Flight 5188's pushback driver and that he failed to conduct a final walk of the aircraft. (*See* Doc. 133 at 51-6). Not only does the plaintiff believe these three DGS employees are lying about what the video depicted; he believes it never existed.[6] The plaintiff, for example, finds it suspicious that he has been unable to secure an affidavit from Heather Fritts, the Deputy Airport Security Manager who showed the videotape to Watts, Allard, and Carter. He also emphasizes that her office "has done three investigations" and still cannot produce a copy of the video. "In other words," he concludes, "there was no video."[7] In addition, the plaintiff objects to Allard viewing the videotape and making conclusions about it, as he was unqualified to conduct an investigation and was a part of the crew assigned to Flight 5188, "thus affirming the bias and disparate treatment meted upon plaintiff." (Doc. 133 at 7). In

---

[6] As evidence that the videotape never existed, the plaintiff provides (1) an email from Jeff Shaw, ACP Airports Paralegal, stating that "no documents or video responsive to your request" can be located and that, "[a]s far as the Airport is concerned, we find absolutely no records or reports of any incidents between April 23 to May 23,2013 [sic] at gates 28&30," and (2) a response to a subpoena which purports to enclose documents and which represents that no other responsive documents are available. (Doc. 133 at 50, 42).

The defendants do not deny that the surveillance video is no longer available. Instead, they attach an email to Shaw, in response to his request for the video, explaining that the Tulsa Airport typically retains surveillance video for no more than 30 days, and that as a result the "video requested for time and date no longer exist [sic], nor are there any saved files." (Doc. 130-11). The plaintiff requested the video on July 13, 2013, more than 80 days after the fuel panel incident.

It bears emphasizing that the defendants could have avoided the expense of a great deal of time and resources by preserving a copy of the videotape. While the failure to do so does not rise to the level of spoliation, *see, e.g.*, *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1413 (10th Cir. 1997) (finding adverse inference regarding plaintiff's missing attendance records unwarranted as plaintiff presented insufficient evidence that employer lost the records in bad faith), in the future the defendants would be wise to preserve evidence so central to their termination decisions.

[7] The plaintiff's own exhibits belie this conclusion. For example, Exhibit E, an email from Joe Iverson, Tulsa Airport Dispatch, indicates not that the video did not exist but that the plaintiff requested it too late: "Our system keeps video for 30 days. . . . It has been deleted." (Doc. 133 at 57).

8

any event, the plaintiff argues, Allard's and Carter's affidavits supporting Watts's claims about the video were "coerced."[8] (*Id.* at 2).

*Third*, the plaintiff argues that he could not be held responsible for Flight 5188's open fuel tank because (1) he was not assigned to the flight and was not a part of the crew that prepared it for takeoff;[9] (2) other members of the team and the flight crew itself did not notice the open panel before the flight left;[10] and (3) an FAA investigation found the fueler responsible for the open fuel door.[11]

*Finally*, the plaintiff argues that discrimination was evident in the Flight 5188 investigation, as he was the only crew member subjected to drug testing and fired. (Doc. 133 at 5-6). At his deposition, the plaintiff testified that five other ramp agents were on duty when Flight 5188 departed, two of whom were black. (Doc. 130-1 at 443:10 – 444:9). According to the plaintiff, "these people were fairly treated and Plaintiff was treated in an unfair manner and in a bias [sic] way and with disparate sets of rules that apply." (*Id.* at 444:11-18).

---

[8] In support of the claim that Allard and Carter produced sworn affidavits under coercion, the plaintiff attaches the affidavits themselves. Needless to say, the affidavits on their face provide no evidence of coercion, and no such evidence is before the Court in any form.

[9] The plaintiff does not put forward any evidence that he was not assigned to Flight 5188 or that he was not Flight 5188's pushback driver. He simply points to a lack of evidence—"[N]o duty log entries could be produced for reasons unknown"—and insists that evidence that he was a part of the team that prepared Flight 5188 was "fabricated" and "coerced." (Doc. 133 at 8, 2).

[10] Of course, the possibility that other crew members might miss an open panel is precisely the reason for a final walk around.

[11] As the defendants point out, the FAA investigation happened after the plaintiff was fired. (*See* Doc. 135 at 7). More importantly, however, the fact that the fueler forgot to close the fuel tank and its panel in no way absolves the pushback driver from conducting a final preflight walk around. Two people can be at fault for the same incident, especially where one is charged with verifying the job the other has done.

The plaintiff brings claims of wrongful termination on the basis of race and national origin, defamation, and intentional infliction of emotional distress. As relief, he requests $50 million for the allegedly wrongful termination, $10 million for emotional distress and damage done to his career, and $1 billion in punitive damages.

## STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In considering a summary judgment motion, the courts determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 at 251-52. The evidence of the non-movant is to be taken as true, and all justifiable inferences are to be drawn in non-movant's favor. *Anderson*, 477 U.S. at 255; *see also Ribeau v. Katt*, 681 F.3d 1190, 1194 (10th Cir. 2012). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment. . . ." *Anderson*, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

"When the moving party has carried its burden under Rule 56[a], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations omitted). When the record, taken as a whole, "could not lead a rational trier of fact to find for

the non-moving party, there is no genuine issue for trial." *Id*. (quotations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. *Garratt v. Walker*, 164 F.3d 1249, 1251 (10th Cir. 1998).

## DISCUSSION

*1. Discrimination*

Assuming *arguendo* that the plaintiff continues to assert a viable Title VII claim, in spite of the fact that his Amended Complaint makes no reference to Title VII (*see* Doc. 103), the plaintiff has not offered evidence sufficient to resist the defendants' summary judgment motion, much less evidence sufficient to support his own motion. In order to state a claim for disparate treatment on the basis of race under Title VII, the plaintiff must demonstrate "(1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008). Once a plaintiff can establish a prima facie case of discrimination or retaliation, the burden shifts to the defendants, who must "articulate some legitimate, nondiscriminatory reason" for, in this case, the plaintiff's termination. *Chavez v. Thomas & Betts Corp.*, 396 F.3d 1088, 1104 (10th Cir. 2005). Once the employer articulates its nondiscriminatory justification for the adverse employment action, the burden then shifts back to the plaintiff to show that the employer's proffered justification is pretextual. *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006). "A Plaintiff can demonstrate pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's reasons for its action, which a reasonable fact finder could rationally find unworthy of credence." *Chavez*, 396 F.3d at 1104

(citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)). If a plaintiff presents evidence that the defendant's proffered reason for the employment decision was pretextual, *i.e.*, unworthy of belief, the plaintiff can withstand a summary judgment motion and is entitled to go to trial. *Kendrick v. Penske Transport Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

Assuming *arguendo* that the plaintiff has established a prima facie discrimination claim, the defendants have articulated a legitimate nondiscriminatory reason for his termination. To wit, after at least five workplace incidents in less than a year for which the plaintiff received some form of discipline, including a Final Warning Letter that threatened the plaintiff with "likely" termination for any infraction, the plaintiff neglected to conduct a final walk around of Flight 5188 and thereby allowed the plane to get off the ground with an exposed fuel port and a fuel cap banging in the wind. The evidence supporting the defendants' nondiscriminatory reason for terminating the plaintiff is strong and includes written statements and affidavits from other team members either identifying the plaintiff as the pushback driver for Flight 5188 or attesting that they last saw the plaintiff near the flight before it took off; three witnesses who watched a video and identified the plaintiff as the pushback driver for Flight 5188; and the plaintiff's own testimony that he was likely the only person wearing the hooded sweatshirt that helped the witnesses identify him. The plaintiff's written statement following the incident indicates that he first wrote that he was not a member of the team that prepared Flight 5188 for takeoff, and then thought better of his statement and edited it to read "I DID NOT *REMEMBER* MARSHALLING OUT FLIGHT 5188 THIS MORNING." (Doc. 130-2 at 21) (emphasis added).

The burden, then, shifts back to the plaintiff to show that the defendants' nondiscriminatory justification for his termination is pretextual. This the plaintiff has not done. He has presented no evidence that the videotape that three witnesses used to tie him to the Flight

5188 never existed, that any of these witnesses lied, or that he was not, in fact, assigned to Flight 5188 as the pushback driver. He has presented no evidence that he was discriminated against on the basis of his race—indeed he testified that similarly situated black employees were not reprimanded, not targeted, not drug tested, and not fired. The plaintiff has put before the Court no evidence whatsoever that DGS discriminated against him on the basis of his race, color, or national origin. Without evidence supporting his claim, the plaintiff's summary judgment motion cannot prevail; nor can his discrimination claim survive the defendants' cross-motion.

2. *Defamation*

The plaintiff has not contested the defendants' facts with respect to his defamation claim, and accordingly he is deemed to have admitted them under Local Rule 56.1. Oklahoma law defines defamation, in relevant part, as a false and unprivileged communication that maligns a person with respect to his office, profession, trade, or business. *Zeran v. Diamond Broad., Inc.*, 203 F.3d 714, 718 (10th Cir. 2000) (citing Okla. Stat. Ann. tit. 12, § 1442).[12] The plaintiff has expressed concern that his association with Flight 5188 will damage his career, but he has not specified or provided any evidence of a slanderous communication. If Watts did communicate to other DGS employees that the plaintiff had failed to conduct a final walk around of Flight 5188,

---

[12] In full the statute provides as follows:

> Slander is a false and unprivileged publication, other than libel, which:
> 1. Charges any person with crime, or with having been indicted, convicted or punished for crime.
> 2. Imputes in him the present existence of an infectious, contagious or loathsome disease.
> 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade or business that has a natural tendency to lessen its profit.
> 4. Imputes to him impotence or want of chastity; or,
> 5. Which, by natural consequences, causes actual damage.

13

the plaintiff has presented no evidence to show that that communication was false, and truth is an absolute defense to defamation. Okla. Stat. Ann. tit. 12, § 1444.1. Furthermore, "under Oklahoma law statements made by one corporate employee during the performance of his duties within the hearing only of other corporate employees does not constitute publication." *Messina v. Kroblin Transp. Sys., Inc.*, 903 F.2d 1306, 1309 (10th Cir. 1990). The plaintiff simply does not have a viable claim for defamation.

   *3. Intentional Infliction of Emotional Distress*

The plaintiff has not contested the defendants' facts with respect to his intentional infliction of emotional distress ("IIED") claim, and accordingly he is deemed to have admitted them under Local Rule 56.1. In any event, the plaintiff's IIED claim depends on his discrimination and defamation claims, which the Court has rejected. To make out an IIED claim under Oklahoma law, the plaintiff must prove that (1) the defendants acted intentionally or recklessly; (2) the defendants' conduct was extreme and outrageous; (3) the plaintiff actually experienced emotional distress; and (4) the emotional distress was severe. *Breeden v. League Services Corp.*, 575 P.2d 1374,1376 (Okla. 1978) (quoting Restatement (Second) of Torts § 46 (1965)).

The trial court acts as a gatekeeper, determining as a threshold matter whether the defendants' alleged conduct is sufficiently extreme and outrageous to allow recovery. *See, e.g., Eddy v. Brown*, 715 P.2d 74, 76 (Okla. 1986). Here, the plaintiff has not presented evidence of any conduct on the part of the defendants that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Breeden v. League Services Corp.*, 575 P.2d 1374,1376 (Okla. 1978) (quoting Restatement (Second) of Torts § 46, comment (d) (1965)).

Instead, the only evidence before the Court indicates that the plaintiff received repeated counseling and warnings regarding his attendance, comportment, and performance, and was then fired for failing to perform his duties. Accordingly, the defendants' summary judgment motion is granted as to the plaintiff's claim for intentional infliction of emotional distress.

**IT IS THEREFORE ORDERED** that the plaintiff's Motion for Summary Judgment (Doc. 89) is **denied** and the defendants' Motion for Summary Judgment (Doc. 129) is **granted**. The remaining motions before the Court (Docs. 154 and 157) are **moot**. A copy of this Opinion and Order will be filed in both Case Nos. 14-CV-48-JED-TLW and 14-CV-49-JED-PJC. A separate judgment in favor of the defendants will also be entered.

**SO ORDERED** this 14th day of October, 2015.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE